# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3354

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of South Dakota. |
| Joseph E. Espinosa, Sr., | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: June 11, 2009
Filed: October 26, 2009

_____

Before SMITH, ARNOLD, and SHEPHERD, Circuit Judges.

_____

SMITH, Circuit Judge.

A jury convicted Joseph E. Espinosa Sr. of aggravated sexual abuse, in violation of 18 U.S.C. §§ 1153, 2241(a)(1), 2241(c), and 2246(2)(A) ("Count IV"), and abusive sexual contact, in violation of §§ 1153, 2244(a)(1), and 2246(3) ("Count VII").[1] The district court sentenced Espinosa to 30 years' imprisonment on the aggravated sexual abuse conviction and 20 years' imprisonment on the abusive sexual contact conviction, with the sentences to run concurrently. The court also sentenced

_____

[1]Espinosa's motion for judgment of acquittal was granted as to Counts I, II, V, VI, and VIII. The jury was unable to reach a verdict on Count III, and the district court dismissed it.

Espinosa to five years of supervised release on each count, with the sentences to run concurrently. On appeal, Espinosa argues that (1) the evidence was insufficient to support his conviction; (2) an expert witness improperly bolstered another witness's credibility; and (3) inadmissible hearsay was improperly admitted. We now affirm Espinosa's conviction on Count IV and reverse his conviction on Count VII because insufficient evidence exists as to the victim's age at the time of the offense conduct.

I. *Background*

Espinosa lived with his girlfriend, Marie Flying, in Rosebud, South Dakota, for 18 years.[2] Flying obtained legal custody of her grandniece, T.H.S., when T.H.S. was an infant and raised T.H.S. in the home that Flying shared with Espinosa.[3] T.H.S. suffers from post-traumatic stress disorder, fetal alcohol syndrome, and mild mental retardation. At age 12, T.H.S. functioned at a mental level of six or seven years old and had a full-scale IQ of 50. T.H.S. resided at a school dormitory during the week and at home with Flying and Espinosa on the weekends.

According to T.H.S., on the weekend of February 25–27, 2007, while she was staying with Espinosa and Flying, Espinosa entered her bedroom while she was sleeping and undressed himself and T.H.S. T.H.S. alleged that Espinosa "got on me" and "stuck his in me." T.H.S. later informed Flying of the incident. Flying called her son, David Flying, to come and pick up T.H.S. T.H.S. stayed with David Flying for the remainder of the weekend. While there, T.H.S. told David Flying what Espinosa did to her. After the weekend, David Flying took T.H.S. back to the dormitory, and he advised T.H.S. to recount the incident to the dormitory staff.

---

[2]All of the events relevant to this appeal occurred on the Rosebud Sioux Indian Reservation.

[3]Although T.H.S. is Flying's grandniece, Flying referred to T.H.S. as her granddaughter, and T.H.S. called Flying "Grandma" and Espinosa "Grandpa."

At school, T.H.S. notified a member of the staff, who then telephoned the Rosebud Sioux Tribe Law Enforcement. T.H.S. was transported to Indian Health Services Hospital in Rosebud, South Dakota. A physical examination at the hospital revealed redness, swelling, and bruising in her vaginal area. Ruth Thomas, a certified physician's assistant (PA), testified that part of T.H.S.'s vaginal area, including inside the vaginal vault, was abraded, sore, raw, "swollen, and it was red, and it was irritated-looking." Thomas testified that T.H.S. was in pain during the vaginal examination. She also opined that the injuries that she observed were caused within the past one, two, or three days. While Thomas attempted to use a speculum during the examination, she discarded it because "it was too painful." A sexual assault kit did not reveal any physical evidence.

Later, the Federal Bureau of Investigation interviewed K.H.S., T.H.S.'s sister. K.H.S. disclosed that Espinosa had previously sexually abused her. She testified that when she and Espinosa were alone at the house, he chased her around the dining room table. On one occasion, she said that he cornered her between the wall and the table, picked her up, and carried her to a nearby couch. He then rubbed her thighs, genitalia, and breasts through her clothing with his hand, despite her objection. According to K.H.S., the encounter lasted between five and ten minutes.

Espinosa was indicted on two counts of aggravated sexual abuse of a child, in violation of 18 U.S.C. §§ 1153, 2241(c), and 2246(2)(A) ("Count I and Count II"); one count of aggravated sexual abuse of a child, in violation of 18 U.S.C. §§ 1153, 2241(c), and 2246(2)(D) ("Count III"); two counts of aggravated sexual abuse of a child, in violation of 18 U.S.C. §§ 1153, 2241(a)(1), 2241(c), and 2246(2)(A) ("Count IV and Count V"); one count of aggravated sexual abuse of a child, in violation of 18 U.S.C. §§ 1153, 2241(a)(1), 2241(c), and 2246(2)(C) ("Count VI"); one count of abusive sexual contact, in violation of 18 U.S.C. §§ 1153, 2244(a)(1), and 2246(3) ("Count VII"); and one count of abusive sexual contact, in violation of 18 U.S.C. §§ 1153, 2244(a)(3), and 2246(3) ("Count VIII"). Counts I through VI alleged

-3-

offenses involving T.H.S., while Counts VII and VIII alleged offenses involving K.H.S.

At trial, following the government's case-in-chief, the district court granted Espinosa's motion for judgment of acquittal on Counts I, II, V, VI, and VIII. The jury returned guilty verdicts on Count IV and Count VII. The jury was unable to reach a verdict on Count III, aggravated sexual abuse, and the court dismissed it. The district court imposed concurrent sentences of 30 years' imprisonment on Count IV and 20 years' imprisonment on Count VII. The court also sentenced Espinosa to five years of supervised release on each count, with the sentences to run concurrently. Espinosa appeals, raising four primary errors, including sufficiency of the evidence.

## II. *Discussion*

On appeal, Espinosa argues that the district court erred by (1) failing to grant his motion for acquittal because the evidence presented was insufficient to prove actual penetration or an attempt at actual penetration; (2) failing to grant his motion for acquittal because the government did not provide sufficient evidence of the age of the complaining witness at the time of the alleged offense; (3) denying his motion for a mistrial after a psychiatrist twice asserted that the complaining witness had been sexually abused; and (4) allowing the government to introduce inadmissible hearsay and vouching statements. After review, we affirm the district court.

## A. *Sufficiency of the Evidence*

Espinosa first attacks the sufficiency of the evidence presented by the government. Specifically, he argues that the government did not prove actual penetration or an attempt at penetration when trying to prove sexual abuse. He also argues that the government did not prove the age of K.H.S., the complaining witness.

Federal Rule of Criminal Procedure 29(a) provides, in relevant part, that "[a]fter the government closes its evidence or after the close of all the evidence, the court on

the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Espinosa asserts that the district court erred in not granting his motion for judgment of acquittal based on insufficient evidence. We review a motion for judgment of acquittal under a de novo standard of review. *United States v. Reddest*, 512 F.3d 1067, 1069–70 (8th Cir. 2008).

> We employ a strict standard of review regarding denials of motions for acquittal, viewing the evidence in the light most favorable to the guilty verdict, resolving all evidentiary conflicts in favor of the government, and accepting all reasonable inferences supported by the evidence. A jury verdict will not lightly be overturned and we will reverse only if no reasonable jury could have found the defendant guilty beyond a reasonable doubt. When reviewing the sufficiency of the evidence to support a conspiracy conviction, we will affirm if the record, viewed most favorably to the government, contains substantial evidence supporting the jury's verdict, which means evidence sufficient to prove the elements of the crime beyond a reasonable doubt.

*United States v. Thompson*, 533 F.3d 964, 970 (8th Cir. 2008) (internal quotations and citations omitted). In granting or denying the motion, the "district court has very limited latitude in ruling upon a motion for judgment of acquittal." *United States v. Baker*, 367 F.3d 790, 797 (8th Cir. 2004).

### 1. *Sexual Abuse of T.H.S.*

Espinosa argues that the evidence was insufficient to prove penetration or an attempt as required under the statute. To convict a defendant of aggravated sexual abuse, as charged in Count IV, the government must prove that "(1) the defendant did knowingly cause and attempt to cause another to engage in a sexual act, (2) by the use of force or threat of force, (3) the defendant is an Indian, and (4) the offense occurred in Indian Country." *United States v. Youngman*, 481 F.3d 1015, 1020 (8th Cir. 2007) (citing 18 U.S.C. §§ 1153, 2241(a), and 2246(2)). A sexual act requires "contact between the penis and the vulva or the penis and the anus, and for purposes of this

subparagraph contact involving the penis occurs upon penetration, however, [sic] slight." 18 U.S.C. § 2246(2)(A). Because Espinosa only challenges the evidence as to whether he knowingly caused or attempted to cause the victim to engage in a sexual act, he necessarily concedes the other elements of the statute.

Espinosa cites *Reddest* to support his sufficiency argument. In *Reddest*, we reversed the defendant's conviction for engaging in a sexual act with a person between the ages of 12 and 16. 512 F.3d at 1071–72. The victim testified that the defendant reached inside her underwear and put his finger "'[r]ight in my—almost close to my [hole].'" *Id.* at 1072. On appeal, we held that this evidence was insufficient to prove penetration of the genital opening because it was unclear "where [the defendant's] finger was or how 'close' it was to the genital opening." *Id.*

Espinosa also relies on *United States v. Plenty Arrows*, which overturned an aggravated sexual abuse conviction for insufficiency of the evidence. 946 F.2d 62, 65 (8th Cir. 1991). In *Plenty Arrows*, the defendant was accused of sexual abuse of a nine-year-old boy. *Id.* at 63. The victim testified that "while his pants were off, [the defendant] touched him 'from my back of my behind' and that [the defendant] had done this 'with his private part.'" *Id.* at 64. On appeal, the defendant argued that the victim's testimony was insufficient to establish "that contact occurred between his penis and the victim's anus." *Id.* We agreed, holding that the victim's testimony alone was "too vague to support the inference that contact involving penetration occurred between the penis and anus" because the "statute is anatomically specific, and the testimony lacks the necessary specificity." *Id.* at 65.

Unlike in *Reddest* and *Plenty Arrows*, the evidence presented here sufficiently supported the jury's verdict. At trial, T.H.S. testified that Espinosa removed her clothes, got on top of her, and "stuck his in me." She stated that his "part" was touching her body. Using an anatomically correct diagram of an unclothed female, T.H.S. circled the genital area and stated that he touched her there. She testified that

her legs were apart when he was on top of her. Then, using an anatomically correct diagram of an unclothed male, T.H.S. circled the genital area, indicating which "part" of Espinosa had touched her. She also testified that it hurt when Espinosa got on top of her.

Moreover, physical evidence gathered following the incident corroborated T.H.S.'s testimony. Thomas, the PA, examined T.H.S.'s vaginal area and testified that part of T.H.S.'s vaginal area was abraded, sore, raw, swollen, red, and "irritated-looking." She also testified that T.H.S. was in pain during the vaginal examination and opined that the injuries she observed were caused within the past one to three days. Accordingly, the evidence was sufficient to establish the first element of the aggravated sexual abuse charge. We affirm the district court's denial of Espinosa's motion for acquittal.

### 2. *Age of K.H.S.*

Next, Espinosa argues that the government failed to prove that K.H.S.'s age was below 12 when the alleged abusive sexual contact occurred for purposes of Count VII. In support of his argument, Espinosa points out that the government (1) never introduced K.H.S.'s birth date into evidence and (2) failed to introduce evidence of a particular date upon which the alleged sexual contact occurred. According to Espinosa, the government failed to prove that K.H.S. was under the age of 12 during the entire period in which the offense conduct could have occurred.

The elements of abusive sexual contact are that Espinosa "(1) knowingly and intentionally engaged in sexual contact with a person under the age of 12; (2) intended to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of any person; (3) is an Indian; and (4) committed the act in Indian country." *United States v. Hollow Horn*, 523 F.3d 882, 890 (8th Cir. 2008) (18 U.S.C. §§ 1153, 2244(a)(1), 2241(c), and 2246(3)). Espinosa only attacks the first element, arguing that the government did not prove that K.H.S. was under the age of 12.

The *Plenty Arrows* case contains helpful analysis for determining the sufficiency of evidence on K.H.S.'s age. In *Plenty Arrows*, "[t]he victim testified that [the defendant] put his penis in the victim's mouth, but was unable to state when that occurred." 946 F.2d at 65. When asked whether the incident occurred over Christmas vacation, the victim responded, "I don't know." *Id*. On appeal, the defendant argued that the evidence was insufficient to support his conviction for aggravated sexual abuse under 18 U.S.C. § 2245(2)(B) because the government failed to prove that "the aggravated sexual abuse occurred 'on or about' December 28, 1988, as alleged in the indictment." *Id*. In response, the government maintained that the jury could have concluded "that the abuse occurred on any date between October 1986 and July 1990—the only period of time that [the defendant] had access to the victim—and that any date during that period would be reasonably near the December 1988 date in the indictment." *Id*.

> With regard to the time span alleged in the indictment, we acknowledged that

> [i]f the date is not a material element of the crime charged, "a variance between the date in the indictment and the proof is not fatal if the proof shows that the acts charged were committed on a date within the statute of limitations *and prior to the return date of the indictment*."

*Id*. (quoting *United States v. Joyner*, 539 F.2d 1162, 1164–65 (8th Cir. 1976) (emphasis added in *Plenty Arrows*). But in *Plenty Arrows*, "[t]he indictment was returned on September 20, 1989," and "[t]he victim's testimony provided no limitation as to the period of time when the oral sodomy occurred." *Id*. As a result, "the act could have occurred . . . at any time up until the trial in July 1990 if [the defendant] had access to the victim during that time." *Id*. The government conceded that the victim was, in fact, around the defendant "up until the time of trial." *Id*.

We held that "[a] verdict cannot be based on an act that could have occurred after the return of the indictment, and the jury had no basis for inferring that the act

occurred before that date." *Id.* Thus, insufficient evidence existed to support the defendant's conviction for aggravated sexual abuse. *Id.* at 65–66.

Regarding the issue of K.H.S.'s age, the present case is substantially similar to *Plenty Arrows*. The indictment alleged that the events occurred "[o]n or about between the 1st day of August, 2002, and the 28th day of September, 2003." On April 16, 2008, K.H.S. testified that she was 16 years old.[4] When asked whether she remembered how old she was when the alleged sexual abuse occurred, she replied, "I don't know." Nor could she recall what grade she was in when the offense conduct occurred. Therefore, K.H.S.'s testimony did not establish how old she was at the time the alleged sexual abuse occurred.

But K.H.S. did testify that Flying had a red car when the offense conduct occurred. The government attempted to establish K.H.S's age by relying on Flying's testimony. According to the government, Flying's testimony shows that the offense conduct occurred during the time frames alleged in the indictment—August 1, 2002 to September 28, 2003—because Flying testified that she once owned a red Ford Mustang that was repossessed either (1) by August 1, 2002, or (2) in the summer of 2003.

Flying testified that she remembered owning a red Mustang. On direct examination, she said that she purchased the car in "2002." When asked during what period of time she owned the car, she replied, "I don't know. I think it was 2000. I only had it for like three years." While still on direct examination, she reaffirmed that she purchased the car in 2002 and owned it for three years. When asked if she had the car up until 2005, she replied, "Somewhere in there, yeah."

---

[4]K.H.S's birth date, which was never presented at trial, is September 29, 1991. The government concedes that Espinosa could not have been convicted of this crime if the act occurred after September 28, 2003, because K.H.S. turned 12 years old on September 29, 2003.

On cross examination, Flying was asked whether she was "absolutely sure" when she bought the car; she replied, "No. Actually, I did. It was 2000." She then said that she was "for sure" that she got the car in 2000. Additionally, she testified that she had the car for "about three years." When asked if she could have had the car for "maybe two years," she replied, "Well, like I said, at the most three years. *I'm not too sure*." (Emphasis added.) According to Flying, it was possible that the car had already been taken by August 1, 2002. She said, "For sure, I know they took it by the summertime." When the district court tried to clarify with Flying when she bought the car and when it was repossessed, she said that she bought it in 2000 and that it was repossessed in the summer, but she could not remember "of what year." On further cross-examination, she said that she had the car for "approximately about almost three years." When the court clarified with her that she had the car "almost three years," she replied, "Almost three years." When she was again asked when she bought the car, she stated that she could not remember when she bought the car. When asked when the car was repossessed, she said, "*I can't remember that*. It was almost summertime then." (Emphasis added.) Then, defense counsel asked, "But it was summertime?" Flying replied, "Yes, almost." When asked whether it was before July 4th "in that summer," she replied, "*I can't remember*." (Emphasis added.) Then, she was again asked if she had "the car two years," and she answered, "At the most."

On redirect examination, she clarified that, to her best recollection, she bought the car in 2000. She said that she had the car "about two years," 'two to three years at the most." She reconfirmed that the car was repossessed in the summertime. Then, counsel asked, "Okay. So if you bought it in 2000 and repossessed it in the summertime, the latest they would have repossessed it is the summer of 2003, correct?" Flying answered, "Yes. I think so. Yeah. Like I said, I can't remember when they came after it." *Id.* at 322. She was then asked, "But that's your best recollection; is that right?" And Flying responded, "Yes, yeah. *I just can't remember*." (Emphasis added.)

On re-cross examination, Flying was asked whether it was possible that she only had the car two years, and it was the summer of 2002, to which she responded, "*Like I said, I can't remember.* At the most, like I say, two to three years. Yeah." (Emphasis added.)

As a threshold matter, Flying's testimony as to when she owned the red Ford Mustang is no better than speculative and thus an insufficient basis for concluding when the alleged abuse occurred. Repeatedly, throughout her testimony, she stated that she could not remember and was not sure of when the car was repossessed. "We cannot sustain a conviction based on mere suspicion or the possibility of guilt." *United States v. Kenyon*, 481 F.3d 1054, 1068 (8th Cir. 2007) (internal quotations and citation omitted) (holding that the evidence was insufficient to support conviction on one of two counts alleging aggravated sexual abuse of a child on basis of contact between defendant's penis and victim's mouth, as victim's testimony that such contact occurred "twice maybe" was immediately followed by her statement that she did not know whether it happened once or twice, and there was no independent evidence of such encounters).

Flying seemed to settle on the summer of 2003 as the repossession date. However, accepting that as the probable date of repossession, in light of the evidence provided to the jury as to K.H.S.'s probable age, K.H.S. would have already turned 12 years old. On April 16, 2008, K.H.S. testified that she was 16 years old. But she could have turned 17 years old the very next day—April 17, 2008. As a result, she could have turned 12 years old on April 17, 2003, or anytime during the following year through April 16, 2004. By the time that the car was repossessed in the summer of 2003, K.H.S. would have already turned 12 years old.

Relying on *Plenty Chief*, the government appears to argue that a failure to prove the age element may be ignored if it demonstrates "that the acts charged were committed on a date within the statute of limitations *and prior to the return date of the*

-11-

*indictment*." 946 F.2d at 65 (internal quotations and citation omitted). The government points out that Flying testified to owning the car not only in the summer of 2003, but also in 2000, 2001, and 2002—periods of time in which K.H.S. would have been under the age of 12. Therefore, the government concludes that the jury had before it evidence that the offense conduct occurred during the time frames alleged in the indictment—August 1, 2002 to September 28, 2003. However, the government misses the point. Its proof failed to establish that K.H.S. was under the age of 12 *during the entire period* in which the offense conduct could have taken place. Flying's testimony indicated that she owned the red Ford Mustang until at least the summer of 2003; therefore, she necessarily owned it both before and after April 17, 2003—the earliest date that K.H.S. could have turned 12 years old. The government presented no evidence to the jury from which it could infer that the offense conducted occurred prior to April 17, 2003.

Finally, the government asserts that the jury could have drawn an inference from the district court's recitation of the indictment allegations during jury selection and from the prosecutor's opening statement as to K.H.S.'s age. But "[i]ndictments, of course, are not evidence." *United States v. Logan*, 210 F.3d 820, 825 n.3 (8th Cir. 2000). Nor are "statements of counsel" evidence. *United States v. Smith*, 508 F.3d 861, 866 (8th Cir. 2007).

Accordingly, we hold that the evidence was insufficient to establish alleged abusive sexual contact occurred for purposes of Count VII.

## B. *Psychiatrist Testimony*

Next, Espinosa argues that his motion for mistrial should have been granted after the psychiatrist improperly bolstered T.H.S.'s credibility. We review a motion for mistrial under an abuse of discretion standard. *United States v. Street*, 548 F.3d 618, 624 (8th Cir. 2008).

An abuse of discretion occurs when a relevant factor that should have been given significant weight is not considered, when an irrelevant or improper factor is considered and given significant weight, or when all proper and no improper factors are considered, but the court in weighing those factors commits a clear error of judgment.

*United States v. West*, 28 F.3d 748, 750 (8th Cir. 1994) (internal quotations and citation omitted).

"It is generally within the discretion of the district court to decide whether the fairness of a trial has been compromised by prejudicial testimony . . . ." *United States v. Brandon*, 521 F.3d 1019, 1026 (8th Cir. 2008). "To determine whether a curative instruction or a mistrial is the proper response . . . , the court must consider whether an inference about the [improper testimony] may be critical in assessing the witness'[s] credibility and whether the witness'[s] credibility is vital to the case." *Street*, 548 F.3d at 628 (internal quotations, alterations in *Street*, and citation omitted). "The district court has broad discretion to grant or deny a motion for mistrial because it is in a far better position to weigh the effect of improper testimony, and because less drastic measures such as a cautionary instruction are generally sufficient to alleviate prejudice flowing from improper testimony." *United States v. Davidson*, 122 F.3d 531, 538 (8th Cir. 1997). "Admission of a prejudicial statement is normally cured by striking the testimony and instructing the jury to disregard the remark." *Brandon*, 521 F.3d at 1026. "We assume that the jury followed the district court's instruction." *United States v. Fletcher*, 322 F.3d 508, 516 (8th Cir. 2003). "When the evidence of guilt is substantial, we may find that the allegedly improper testimony was harmless." *Brandon*, 521 F.3d at 1026.

During direct examination of Dr. Tamara Vik, a child and adolescent psychiatrist who worked directly with T.H.S., the government asked Dr. Vik about her diagnostic impressions of T.H.S. Dr. Vik answered that T.H.S. suffers from "[p]osttraumatic stress disorder." Then, the government asked Dr. Vick about her

diagnostic impressions of T.H.S. "with respect to fetal alcohol syndrome." Dr. Vick answered that T.H.S. had "partial fetal alcohol syndrome with confirmed exposure" and that "[t]here is also mild mental retardation and [that T.H.S. is the] victim of physical and sexual abuse." Espinosa's counsel objected to the answer, and the district court advised the jury that it "should disregard that last opinion as to the fact that the—that T.H.S. is a victim of sexual and physical abuse. Disregard that."

The government then asked Dr. Vik "whether T.H.S.'s posttraumatic stress disorder would be consistent or inconsistent with her being sexually abused." After the district court overruled a defense objection, Dr. Vik replied that her opinion was "[t]hat [T.H.S.] has suffered sexual abuse." After Espinosa's counsel objected, the district court stated to the jury:

> The answer is stricken. The jury should disregard that. That's not up to her to tell you that, nor is it up to me to tell you that or anybody else. That's entirely up to you, and so that's invading the province of the jury, and the answer is stricken. The question is—it's also not responsive. The question was whether it's consistent or inconsistent.

After the government concluded its direct examination of Dr. Vik, Espinosa moved for a mistrial. Noting that Dr. Vik's opinion was not necessarily tied to sexual abuse by Espinosa, the court observed, outside the hearing of the jury:

> I would declare a mistrial were there not—had the Court not permitted the defendant to go into this evidence of other sexual abuse of the defendant. So that mitigates it. And I think there is not sufficient grounds for a mistrial, given the Court's immediate corrective action, and I may instruct the jury further on that. So that motion will be denied.

Espinosa suggests that Dr. Vik's improper assertions of knowledge that T.H.S. suffered sexual abuse critically undermined the jury's ability to fairly evaluate T.H.S.'s credibility. But the district court clearly and promptly admonished the jury to

disregard that part of Dr. Vik's testimony that could be construed as having invaded the province of the jury, and we have repeatedly held that jurors are presumed to follow the court's instructions. *See Fletcher*, 322 F.3d at 516. After having heard the entirety of the evidence, the district court again admonished the jury, stating that the "[t]estimony and questions that I struck from the record, or told you to disregard, are not evidence and must not be considered." After the district court instructed the jury, Espinosa's counsel stated, "I appreciate that the Court gave a curative instruction, and the Court's demeanor and tone was very firm in addressing the jury."

Moreover, the district court explained that its ruling was based on "the fact that there is going to be evidence that the alleged victim has made statements as to other sexual abuse . . . . So it's not tied to the victim necessarily." Later, T.H.S. testified to several other allegations she had made in the past concerning sexual abuse that she had suffered, none of which involved Espinosa.

We have also held that where the evidence is substantial, we will find the improper testimony harmless. *Brandon*, 521 F.3d at 1026. Here, the jury could have disregarded Dr. Vik's testimony and nonetheless found that T.H.S. had been abused. T.H.S. testified that Espinosa "stuck his in me." Thomas, the PA, testified that T.H.S.'s vaginal area was abraded, sore, raw, swollen, red, and "irritated-looking." Thomas also testified that the injury she observed had occurred within the last few days. Any error by the district court in failing to grant a mistrial was harmless. *Id*. In sum, based on the evidence presented at trial and the district court's curative instructions as to Dr. Vik's testimony, the district court did not abuse its discretion in denying Espinosa's motion for a mistrial.

## C. *Inadmissible Hearsay*

Finally, Espinosa argues that the district court abused its discretion by admitting hearsay statements over his objection. He asserts that the government introduced multiple prejudicial statements from witnesses attesting to T.H.S.'s alleged prior

consistent statements accusing Espinosa of abuse. "Evidentiary rulings are reviewed for abuse of discretion, and we afford deference to the district judge who saw and heard the evidence."[5] *United States v. Davidson*, 449 F.3d 849, 853 (8th Cir. 2006) (internal quotations and citation omitted). In addition to showing an error, Espinosa must establish that the error was not harmless. *United States v. Eagle*, 498 F.3d 885, 888 (8th Cir. 2007). "An error is harmless if we conclude that no substantial rights of the defendant were affected and that the error did not influence or had only a very slight influence on the verdict." *Id.* (internal quotations and citation omitted). Rule 801 defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). Hearsay is inadmissible unless it falls within an established exception. Fed. R. Civ. 802. Espinosa argues that the district court abused its discretion by allowing multiple witnesses to testify to out-of-court statements in violation of the hearsay rules. He argues that the cumulative effect of this testimony was to improperly bolster T.H.S.'s credibility. We disagree.

Espinosa first argues that the district court erred when it allowed the government to elicit testimony from Marie Flying implying that T.H.S. had accused Espinosa of an abusive act. The testimony went as follows:

Q.     And what did you say to him?

A.     I just asked him if it was true.

Q.     And what was his response?

---

[5]In its brief, the government advocated a plain error standard of review. But the government did not set out which statements were not objected to before the district court. Espinosa contends that all of the statements with which he takes issue were properly objected to below. We agree with Espinosa and, therefore, apply the abuse-of-discretion standard rather than the more deferential plain error standard.

MS. MINER: Objection. Hearsay.

THE COURT: Overruled.

Q.    (BY MR. SEILER) You may answer. What was the defendant's response after you asked him if it was true what [T.H.S.] said?

A.    He was too busy to even do things like that.

*   *   *

Q.    (BY MR. SEILER) When you say you had faith in him, that he wouldn't do it, you don't know whether he did it or he didn't do it, do you?

MS. MINER: Objection, Your Honor. Improper question, not relevant, and invades the province of the jury.

THE COURT: Overruled. She may answer . . . .

A.    No . . . .

Q.    And when you confronted him about the allegations, with respect to [T.H.S.], he didn't deny them, did he?

A.    No.

Second, Espinosa objects to Flying's testimony regarding conversations she had with T.H.S. about Espinosa, Flying's description of T.H.S.'s appearance, and Flying's statement that she wanted T.H.S. to get out of the house for T.H.S.'s safety.

Third, Espinosa objects to the district court's ruling regarding David Flying's testimony during direct examination:

A. I asked [T.H.S.] what happened and she told me, same thing about what my mom told me.

MS. MINER: Objection, Your Honor, as to what was said to him. Calls for hearsay.

THE COURT: Well, he hasn't said yet. Overruled.

Q. (BY MR. SEILER) So after you got to your residence, you did have a conversation with [T.H.S.]?

A. Yes.

Q. And what she told you, was that consistent with what your mom told you [T.H.S.] said?

MS. MINER: Your Honor, I would object. It doesn't necessarily call for hearsay, but it goes towards vouching for what one person apparently said in connection with another person. It's an improper question.

THE COURT: Overruled.

Q. (BY MR. SEILER) You may answer, sir.

A. What was the question?

Q. If what [T.H.S.] told you when you got back to your residence was consistent with what your mom said [T.H.S.] told her?

MS. MINER: Same objection.

A. Yes.

THE COURT: Overruled.

Q. Now, when you went over to the Espinosa residence after you were called by your mother, did your mother indicate if [T.H.S.] made accusations with respect to the defendant concerning [T.H.S.]?

MS. MINER: Objection. Hearsay.

THE COURT: Overruled. Just answer that yes or no, sir.

Q. (BY MR. SEILER) Did your mother tell you if [T.H.S.] made accusations regarding the defendant?

A. Yeah.

Q. Okay. And did she repeat those to you?

A. Yeah.

MS. MINER: Objection. Hearsay.

THE COURT: Same ruling. Overruled. Again, you may have a standing objection.

Q. (BY MR. SEILER) And describe her demeanor in terms of – as she was telling you this, as your mother was telling you this, describe her demeanor . . . .

A. She was crying and kind of upset a little bit but mostly crying . . . .

Q. When your mother told you about the accusation, if you know, was the defendant in the area, in the vicinity?

Q. (BY MR. SEILER) You are in the house, Mr. Flying, and your mother has told you about the accusation. Where was the defendant?

A. On the couch in the living room.

Q.   Okay. And where were you and your mother standing when she told you about the accusations?

A.   In the living room by the door.

Q.   Okay. How far from the defendant?

A.   About a foot.

Q.   Okay. Did she say it loud enough for the defendant to hear?

A.   Yeah. She was crying.

Fourth, Espinosa argues that the following testimony of Cecilia Spotted Tail, T.H.S.'s dormitory counselor, constituted inadmissible hearsay:

Q.   [BY MR. SEILER] And what was the nature of the contact you had with [T.H.S.]? You said she came to your office?

A.   [CECILIA SPOTTED TAIL] Yes . . . .

Q.   Okay. And if you know, did the special ed coordinator bring her to your office?

A.   Yes, she did.

Q.   Okay. And again, if you know, was that based upon disclosures that [T.H.S.] had made to her?

A.   Yes.

     MS. MINER: Objection. It calls for—it's based on hearsay.

     THE COURT: Overruled.

Q.   (BY MR. SEILER) Your answer is yes?

A. Yes.

Q. Okay. And what was the purpose of the special education coordinator bringing [T.H.S.] to your office?

A. For her to tell me what she had told her.

Q. Okay. And at that point did [T.H.S.] make disclosures to you?

A. Yes, she did.

Q. Okay.

MS. MINER: Your Honor, I would object again. The answer is based on hearsay from [T.H.S.].

THE COURT: Overruled.

Q. (BY MR. SEILER) And based on these disclosures, what did you do?

A. I took [T.H.S.] into my office and she was upset by them . . . .

Q. And was it at that point she made additional disclosures to you?

A. Yes.

MS. MINER: Objection, Your Honor. It goes to hearsay statements from [T.H.S.].

THE COURT: Overruled.

MS. MINER: I would object to the Government's use of the word "disclosures." That has specific prejudicial overtones to it. If he is going to ask if [T.H.S.] said something to her, that's one thing, but the Government characterizing it as "disclosures," is—well, it's prejudicial.

-21-

THE COURT: Overruled.

Q.    (BY MR. SEILER) And based upon the information that you received from [T.H.S.] what did you do?

A.    She just started telling me what she—what had happened to her.

MS. MINER: Objection. That's hearsay.

THE COURT: Overruled. . . . .

Q.    (BY MR. SEILER) Did you call anybody? What did you do?

A.    Yes. I contacted my supervisor.

Q.    Okay. And do you know, were the police called?

A.    Yes . . . .

Q.    (BY MR. SEILER) And are you a mandatory reporter when it comes to child abuse or child sexual abuse?

A.    Yes, I am.

Finally, Espinosa disputes the admission of the following testimony of Melissa Isham:

Q.    Without saying what [T.H.S.] did, did [T.H.S.] tell you about things that happened between her and [Espinosa]?

MS. MINER: Objection. That calls for hearsay.

THE COURT: Overruled.

Q.    (BY MR. SEILER) You can answer.

-22-

THE COURT: Just answer that yes or no.

Q.    Yes.

Q.    (BY MR. SEILER) Okay. On how many different times did she tell you?

MS. MINER: Your Honor, I would like a standing objection to this line of questioning. It calls for hearsay.

THE COURT: Overruled. She may answer.

Q.    (BY MR. SEILER) Did she tell you about it more than once?

A.    Yes.

Espinosa argues that the cumulative effect of these statements undermined his credibility and improperly vouched for T.H.S.'s credibility. He relies on *Tome v. United States*, 513 U.S. 150 (1995), for the proposition that prior consistent statements are not admissible for bolstering purposes. But this case is distinguishable from *Tome*. In *Tome*, six witnesses were allowed to tell the jury what the victim had told them regarding specific, detailed accounts about how the defendant had sexually abused the victim. *Id*. at 154. These witnesses were allowed to "recount [the complaining witness's] detailed out-of-court statements to them." *Id*. at 165. The Supreme Court held that the victim's hearsay statements about the alleged assault were inadmissible as prior consistent statements. *Id*. at 166–67. But, in the instant case, the district court never allowed the witnesses to repeat any of T.H.S.'s out-of-court statements. The statements were presented, not for the truth of the matter asserted, but merely to show that the witnesses had conversations with T.H.S. and the witnesses' subsequent actions.

Espinosa also relies on *United States v. Bercier*, 506 F.3d 625 (8th Cir. 2007), for the proposition that the government may not introduce hearsay statements to

-23-

bolster the credibility of the complaining witness. In *Bercier*, after the defendant was convicted of aggravated sexual abuse and abusive sexual contact, he appealed, arguing that the district court abused its discretion in admitting hearsay testimony. *Id*. at 627. At trial, after the victim's testimony, the victim's physician testified to exactly what the victim told her after the assault. *Id*. at 631. The physician testified that "[the victim] stated that [the defendant] had—had sexually assaulted her, and she said that he had gone—gone down on her . . . ." *Id*. The physician also testified that the victim said that "[the defendant] started kissing her ear and her breasts and doing gross stuff and that she—that he started to have oral sex with her. And she pushed him away and said no, and that he didn't seem to understand that she was saying no." *Id*. On appeal, we held that the only purpose for this testimony "was to bolster [the victim's] trial testimony." *Id*. at 633. Because the entire case turned on the credibility of the victim, this bolstering "tipped the scales unfairly." *Id*. We held, therefore, that the district court's error in allowing the testimony was not harmless, and we ordered a new trial. *Id*. But this case is distinguishable from *Bercier* because, here, the district court did not allow the witnesses to repeat the content of what T.H.S. had said. *See United States v. Two Elk*, 536 F.3d 890, 900 (8th Cir. 2008) (holding that the testimony was permissible and did not amount to inadmissable hearsay where the declarant did not repeat the out-of-court statements but only answered "yes" or "no" to the questions). Instead, each witness, in response to questions regarding their knowledge of the abuse, only answered "yes" or "no." The witnesses did not recount the statements that T.H.S. made to them.

Moreover, Espinosa has not shown that any alleged error that may have occurred was not harmless. The jury heard testimony from the victim who reported the abuse immediately. Evidence was presented that T.H.S. suffered an injury to her genital area, which was consistent with sexual abuse. Therefore, Espinosa has not shown that any error had more than "a very slight influence on the verdict." *Eagle*, 498 F.3d at 888. The district court did not abuse its discretion in allowing the testimony.

### III. *Conclusion*

For the foregoing reasons, we affirm Espinosa's conviction on Count IV and reverse his conviction on Count VII because insufficient evidence exists as to K.H.S.'s age at the time of the offense conduct. We remand the case for entry of a judgment of acquittal on Count VII and for further proceedings consistent with this opinion.

_____